# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR07-4095-LTS |
| vs. | |
| LARRY CONNER, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

## I.   INTRODUCTION

This case is before me on defendant Larry Conner's motion (Doc. No. 141) for compassionate release. The Government has filed a response (Doc. No. 147) and Conner has filed a reply (Doc. No. 151). Oral argument is not necessary. *See* Local Rule 7(c).

## II.   BACKGROUND

On October 17, 2008, Conner pleaded guilty to one count of conspiracy to distribute 500 grams or more of methamphetamine mixture and 50 grams or more of methamphetamine actual after a felony drug conviction and one count of possession with intent to distribute 50 grams or more of methamphetamine mixture after a felony drug conviction. *See* Doc. No. 93. At Conner's sentencing hearing on January 7, 2009, United States District Judge Mark W. Bennett calculated a guideline range of 262 to 327 months, based on a total offense level of 34 and a criminal history category VI. *See* Doc. No. 105. Because Conner had a previous felony drug conviction, he faced a mandatory minimum of 240 months. *See* Doc. No. 108 at ¶¶ 51, 93. However, the parties entered into a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) in which they jointly recommended a sentence of 210 months' imprisonment. *See* Doc. No. 105-2. That sentence was possible after Judge Bennett granted the Government's motion

for a downward departure pursuant to United States Sentencing Guideline (U.S.S.G.) § 5K1.1 and 18 U.S.C. § 3353(e). *See* Doc. No. 105. Judge Bennett accepted the plea agreement and sentenced Conner to 210 months' imprisonment. *Id.*

Conner had health issues at the time of his sentencing. His presentence investigation report (PSR) states:

> The defendant suffers from ongoing and extensive medical health issues. The majority of his records are maintained by the U.S. Department of Veterans Affairs. He experienced a ruptured appendectomy in 1965, a hernia in 1967, and thoracotomy in 1999. In addition, he has been diagnosed with multi-level spinal stenosis, Chronic Obstructive Pulmonary Disease, congestive heart failure, Hepatitis B and C, Peripheral Neuropathy, diabetes, hypertension, tobacco abuse, severe Lumbar Radiculopathy, and Lubmar Disc Degeneration. The defendant has also been subject to multiple surgeries. He last underwent back surgery on March 16, 2007. While this summary may not reflect the extent of the defendant's multiple medical conditions, they are severe.

Doc. No. 108 at ¶ 77. Conner indicated before sentencing that he was going to file a motion for a downward departure because of his health issues pursuant to U.S.S.G. § 5H1.4. *Id.* at 22. However, because the parties entered an 11(c)(1)(C) agreement and Judge Bennett accepted it, the motion for downward departure was not filed and Judge Bennett did not consider Conner's health issues at sentencing. *See* Doc. No. 108-3.

According to the Bureau of Prisons (BOP) website, Conner is located at Rochester FMC and his projected release date is May 14, 2023.

## III.   COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is extremely limited. One way a court may modify a sentence is through "compassionate release" as outlined in 18 U.S.C. § 3582(c)(1)(A), which was recently modified by the First Step Act of 2018 (FSA). *See* Pub. L. No. 115-391, § 603. In the past, 18 U.S.C. § 3582(c)(1)(A) permitted a court to reduce a defendant's term of imprisonment only upon the motion of the Director of Bureau of Prisons (BOP). The FSA modified §

2

3582(c)(1)(A) such that a defendant may now directly petition the court "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *See Mohrbacher v. Ponce*, No. CV18-00513, 2019 WL 161727, at *1 (C.D. Cal. Jan. 10, 2019) (discussing modifications made to § 3582(c)(1)(A) by the FSA); *see also United States v. Perez-Asencio*, No. CR18-3611, 2019 WL 626175, at *2–3 (S.D. Cal. Feb. 14, 2019).

If a defendant fully exhausts administrative remedies, the court may, upon motion of the defendant, reduce the defendant's sentence, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable, if the court finds that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . .

18 U.S.C. § 3582(c)(1)(A). Conner does not meet the requirements of § 3582(c)(1)(A)(ii). He has not served at least 30 years in prison and was not sentenced pursuant to 18 U.S.C. § 3559(c) to life in prison. Accordingly, Conner's only possible avenue for relief is § 3582(c)(1)(A)(i).

The starting point in determining what constitutes "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i) is the Sentencing Guideline discussing compassionate release issued by the United States Sentencing Commission. *See* U.S.S.G. § 1B1.13 (U.S. Sentencing Comm'n 2018); *see also United States v. Hall*, No. CR98-7, 2019 WL 6829951, at *3 (E.D. Ky. Dec. 13, 2019); *United States v. Rivernider*, No. CR10-222,

2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). The Guideline provides that extraordinary and compelling reasons exist in the following circumstances:

(A) Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

This Guideline predates the FSA and has "not been amended to reflect that, under the FSA, a defendant may now move for compassionate release after exhausting

4

administrative remedies." *Rivernider*, 2019 WL 3816671, at *2. Courts are split on whether the policy statement is binding because it predates the FSA's changes to 18 U.S.C. § 3582(c)(1)(A). A number of district courts have concluded that Guideline § 1B1.13 cmt. n.1 does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See, e.g., United States v. Rodriguez*, CR17-00021, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019); *United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Brown*, No. CR05-00227, 2019 WL 4942051, at *4 (S.D. Iowa Oct. 8, 2019); *United States v. Fox*, CR14-03, 2019 WL 3046086, at *3 (D. Me. July 11, 2019); *United States v. Beck*, CR13-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *United States v. Cantu*, No. CR05-458, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019). Other courts have concluded that extraordinary and compelling reasons exist only if they are included in the Guideline. *See, e.g., United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019).

As I have previously stated, I agree with those courts that have found that although the Guideline provides helpful guidance on what constitutes extraordinary and compelling reasons, it is not conclusive given the recent statutory changes. *See United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8, 2020); *see also Rodriguez*, 2019 WL 6311388, at *7 (Congress knew that the BOP rarely granted compassionate release requests prior to the FSA, and the purpose of the FSA is to increase the number of compassionate release requests granted by allowing defendants to file motions in district courts directly even after the BOP denies their request); *Brown*, 2019 WL 4942051, at *3 (same).

## IV.  DISCUSSION

### A.  *Exhaustion of Administrative Remedies*

On February 26, 2020, Conner submitted an administrative request for compassionate release to his warden. Doc. No. 147-2. The request did not mention the

COVID-19 pandemic but did refer to his medical conditions.  *Id.*  On March 4, 2020, Conner's warden wrote to the BOP Office of General Counsel, recommending that Conner be considered for compassionate release.  Doc. No. 147-3.  On March 27, 2020, Kadeem Hobson, a Probation Officer in the Southern District of Iowa, wrote to Conner's case manager that the Southern District of Iowa has approved the Iowa Veterans Home as a location Conner could reside upon release.  Doc. No. 147-4.

On March 30, 2020, Dr. Jeffery Allen sent a letter to General Counsel summarizing Conner's medical history.[1]  Doc. No. 147-6.  Dr. Allen concluded that Conner did not meet the criteria for compassionate release because, despite his health issues, he was still able to complete most of his activities of daily living (ADLs).  *Id.* at 2.  He also concluded that Conner was not experiencing deteriorating mental or physical health that substantially diminished his ability to function in a correctional facility.  *Id.* On April 6, 2020, the BOP Office of General Counsel wrote to Conner's warden that the request for compassionate release was denied for the reasons explained by Dr. Allen. Doc. No. 147-5.

On April 21, 2020, Conner's counsel submitted another request for compassionate release to the warden, stating that Conner was making the request due to the COVID-19 pandemic and his health issues.  Doc. No. 142-1.  As of May 27, 2020, the warden has not responded.  Doc. No. 147 at 3.  The Government concedes that Conner has exhausted his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A).

**B.**      ***Extraordinary and Compelling Reasons***

Conner argues that extraordinary and compelling reasons are present here because of his medical conditions and because he is at an extremely high risk of severe complications and death if were infected with COVID-19.  Doc. No. 142 at 11.  He

---

[1] It is unclear from the record what position Dr. Allen holds within the BOP.  His title in his letter is only "Medical Director."  Doc. No. 147-6.  Dr. Allen's name does not appear in any of Conner's medical records, so he does not seem to be a treating physician.

6

argues that he is at risk of contracting COVID-19 while he is incarcerated at Rochester FMC. *Id.* at 12. The Government does not dispute that Conner's medical conditions place him at a high risk of serious illness and death if he were infected with COVID-19. Doc. No. 147 at 4. However, the Government argues that Conner cannot demonstrate that he is less likely to contract COVID-19 at his proposed release location, the Iowa Veterans Home, than at Rochester FMC. *Id.* The Government states that there are confirmed cases of COVID-19 at the Iowa Veterans Home, but no active cases at Rochester FMC. *Id.* The Government also argues that the BOP has taken many steps to mitigate the treat of COVID-19 in its facilities. *Id.* at 4–9.

### 1. Conner's Health Conditions

Conner's health conditions could constitute extraordinary and compelling reasons even without considering COVID-19. Guideline § 1B1.13 cmt. n.1(B) provides that extraordinary and compelling reasons exist where a defendant is at least 65 years old, is experiencing a serious deterioration in physical health because of the aging process and has served at least 10 years or 75 percent of his term of imprisonment, whichever is less. Conner is 73 years old and has served at least 10 years of his term of imprisonment. *See* Doc. No. 108 at 2. In addition, his medical records demonstrate that he is experiencing a serious deterioration in physical health because of the aging process.

On March 26, 2020, Dr. Claudia Nassaralla, one of Conner's treatment providers, prepared a summary of Conner's health issues. Doc. No. 145-1 at 412–14. Her report lists 38 diagnosed health issues: type 2 diabetes mellitus, diabetic neuropathy, hypertension, stage 3 chronic kidney disease, vitamin B12 deficiency, vitamin D deficiency, heart failure, spinal stenosis, status post laminectomy syndrome, severe lumbar radiculopathy, severe osteoarthritis of the knee, right hand arthritic pain, bilateral lower extremity vascular insufficiency, history of venous stasis ulcers, history of frostbite injury, history of recurrent lower extremity cellulitis, left shoulder arthritis, morbid obesity, obstructive sleep apnea, history of syncope and presyncope, multiple episodes

7

of acute respiratory failure secondary due to pneumonia with hypercapnia and hypoxia requiring BiPAP and intubation, chronic obstructive pulmonary disease (COPD), chronic HBV versus natural immunity after an infection, history of squamous cell carcinoma, history of actinic keratosis, history of tobacco use, history of alcohol use, history of marijuana use, history of methamphetamine use, history of heroin use, opioid dependence with a history of narcotic overdose, probable myoclonic jerks, probable essential tremor, diplopia probably due to sixth nerve palsy, cataracts, anemia and onychomycosis. *Id.* at 412–13. Dr. Nassaralla's report further states:

> Mr. Conner was hospitalized once since his arrival at FMC Rochester, MN on 12/2018 [with] septic shock secondary pneumonia needing ICU stay. His chronic obstructive pulmonary disease (COPD) is getting progressively worse. He is currently needing to use supplemental oxygen longer throughout the day. On 11/12/19, he had a pulmonology consultation for nodule pulmonary and COPD. Pulmonology stated given his comorbidities, he will be a very poor candidate for any aggressive treatment. On 12/16/19, his CT chest showed "mild upper lobe predominant centrilobular emphysema; resolution of the previously described 12 x 7 mm subpleural nodule in the posterior right upper lobe; stable appearance of few additional small solid pulmonary nodules and micronodules such as a 3 mm nodule in the right upper lobe and a 4 x 6 mm right lower lobe juxtapleural nodule; elevation of the left hemidiaphragm is again noted with partial atelectasis of the lingula and left lower lobe; there is subsegmental atelectasis/scarring in the right middle lobe and right lower lobe; there is mild bilateral pleural thickening, with unchanged right pleural calcifications."

> He also needs constant care with his lower extremity skin and has been followed by wound care nurse for the past 2 years. He has chronic pain due to his lumbar spinal stenosis, severe lumbar spine radiculopathy and severe osteoarthritis on the knees. He was able to lose weight and has been working hard to achieve better glycemic control of his diabetes mellitus type 2.

> In terms of his ability to do instrumental activities of daily living, he is able to dial a phone, to use the computer to communicate with staff, to independently plan and prepare snacks/meals outside of food services and to manage TRULINCS account independently. However, he is able to perform light daily tasks, but he cannot maintain acceptable level of

cleanliness. All his laundry must be done by others. His travel would be limited to taxi or automobile with assistance of another. Currently his medications is managed by nursing staff. His instrumental activities of daily living total score is 5 out [of] 9.

In terms of his current functional ability based on the physical self-maintenance scale. He requires partial dressing and uses the assistance [of] an electric wheelchair. He is independent with toileting, feeding, grooming and bathing. His functional ability score is 4 out of 6.

*Id.* at 413–14.

Dr. Francois Rollin also prepared a report, at the request of Conner's counsel, summarizing Conner's medical records and giving his opinion on the risk COVID-19 poses to Conner. *See* Doc. No. 142-2. Dr. Rollin is an Assistant Professor of Medicine at the Emory University School of Medicine within the Division of General Medicine and Geriatrics. Doc. No. 142-3. Dr. Rollin wrote, in part:

Importantly, [Conner's] COPD is severe enough to require chronic supplemental oxygen (3.5 liters of oxygen), to have caused a recent COPD exacerbation in April 2019, and to have been complicated by four recent hospitalizations with acute [or] chronic respiratory failure in December 2018, July 2016, March 2016, and one requiring intubation and mechanical ventilation in May 2014. He was last hospitalized in December 2018 with septic shock due to pneumonia and required ICU level care at that time. He uses 3 different inhalers, multiple times a day to help control his COPD and his last test of lung function found him to have both restrictive and obstructive disease and defined him as GOLD Class 3 severe COPD . . . .

Aside from these major medical conditions, Mr. Conner also suffers from spinal stenosis with ongoing pain and limitations to his mobility despite undergoing lower back surgery (L2-L4 lumbar fusion and laminectomy) on 3/16/2007. His mobility deficits require the use of a motorized wheelchair, he also has severe knee osteoarthritis, chronic leg and foot wounds due to poor circulation in his legs (vascular insufficiency) requiring constant wound care. He also has a history of heavy tobacco use (80 pack-year history, now quit).

Doc. No. 142-2 at 1–2.

Although many of Conner's health conditions existed at the time of the offense conduct and his sentencing, his health conditions have seriously worsened because of the

9

aging process. His COPD has advanced to the point that he requires daily chronic supplemental oxygen, uses multiple inhalers multiple times a day and has been hospitalized four times in the last six years for respiratory failure. Conner reported in August 2019 that he was unable to be off of supplemental oxygen for more than 20 minutes. Doc. No. 146 at 278. He requires the use of a motorized wheelchair due to spinal stenosis and chronic back pain. He needs constant care for leg and foot wounds due to poor circulation in his legs. The BOP also appears to be monitoring Conner for possible signs of lung cancer.

The deterioration of Conner's health does not appear to be caused by an unwillingness to follow medical advice. Conner's PSR indicates that at the time of sentencing he was "ignoring simple medical advice, such as a diet absent sugar." Doc. No. 108-2 at 3. However, recent records indicate Conner is making an effort to manage his diet and exercise the best he can. Medical records indicate that Conner participates in and enjoys exercising activities. *See* Doc. No. 146 at 25, 197; Doc. No. 146-1 at 62, 100, 126. Records also show that Conner is working on controlling his diet and eating less. Doc. No. 146 at 60, 116; Doc. No. 146-1 at 126, 413. He has recently lost 15 pounds and is continuing to try to lose weight. Doc. No. 146 at 107, 117, 304; Doc. No. 146-1 at 127, 413.

Other district courts have found extraordinary and compelling reasons in similar situations. *See United States v. Clyne*, No. 1:16-CR-115-BLW, 2019 WL 3292349, at *2 (D. Idaho July 22, 2019) (defendant was 72 years old and experienced several heart attacks while incarcerated and had a pacemaker implanted, and could only walk with the aid of a walker); *United States v. Johns*, No. CR 91-392-TUC-CKJ, 2019 WL 2646663, at *3 (D. Ariz. June 27, 2019) (defendant was 81 years old and suffered from osteoporosis, osteoarthritis, severe heart disease, a stroke and peripheral vascular disease); *United States v. McGraw*, No. 2:02-cr-00018-LJM-CMM, 2019 WL 2059488, at *3–4 (S.D. Ind. May 9, 2019) (defendant was 72 years old, required a wheelchair and a portable oxygen machine and suffered from type two diabetes with peripheral

10

neuropathy, hyperlipidemia, emphysema, chronic kidney disease stage II and chronic pain). Additionally, the warden of his facility recognized that Conner's situation could be extraordinary and compelling and recommended that Conner be considered for compassionate release, even before the COVID-19 pandemic. *See* Doc. No. 147-3.

The BOP Office of General Counsel found that Conner did not meet criteria for compassionate release. *See* Doc. No. 147-5. General Counsel relied on Section 3(b) and Section 4(b) of the BOP's Program Statement for compassionate release.[2] Section 3(b) provides that a defendant is eligible for reduction of his sentence if he is completely disabled, meaning he cannot carry on any self-care and is totally confined to a bed or chair, or is capable of only limited self-care and is confined to a bed or chair more than 50 percent of waking hours. Section 4(b) provides a defendant is eligible for a sentence reduction if he is 65 or older, suffering from chronic or serious medical conditions related to the aging process, experiencing deteriorating mental or physical health that substantially diminishes his ability to function in a correctional facility, conventional treatment promises no substantial improvement to his mental or physical condition and he has served at least 50 percent of his sentence. General Counsel based its denial on Conner's ability to independently perform the majority of his ADLs and his ability to function in a correctional facility. *See* Doc. No. 147-5.

However, Guideline § 1B1.13 cmt. n.1(B), does not require that a defendant is unable to independently perform the majority of his ADLs or that he be unable to function or care for himself in a correctional facility. It states that extraordinary and compelling reasons exist if a defendant is at least 65 years old, is experiencing a serious deterioration in physical health because of the aging process and has served at least 10 years or 75

---

[2] *BOP Program Statement 5050.50: Compassionate Release/Reduction in Sentence: Procedures for Implementation for 18 U.S.C. §§ 3582 and 4205(g)*, Federal Bureau of Prisons (Jan. 17, 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

percent of his term of imprisonment, whichever is less. Conner meets all of these requirements.[3] Thus, I find that Conner presents extraordinary and compelling reasons independent of COVID-19. However, I will also consider the additional factor of the COVID-19 pandemic and its impact on Conner.

## 2. *COVID-19 Pandemic*

The COVID-19 pandemic adds a greater urgency to the extraordinary and compelling reasons that already exist here. The Centers for Disease Control (CDC) lists nine categories of people who might be at higher risk from severe illness from COVID-19.[4] Conner appears to fit in *six* of these categories. He is 73 years old, suffers from a chronic lung disease (COPD), has a serious heart condition (heart failure), is severely obese, has diabetes and suffering from stage three chronic kidney disease.

Dr. Rollin gave the following medical opinion on Conner's COVID-19 risk:

> My professional medical opinion, based on my review of the current medical evidence of COVID-19 infection and the patient's medical records, I believe that Mr. Larry Conner is at extremely high risk of severe complications and death if he were to be infected with coronavirus (SARS-CoV2). As detailed above, his age, severe COPD, Diabetes, Obesity, history of smoking, and chronic kidney disease all make him especially vulnerable and make his risk of death from infection extremely high. I recommend [] all possible steps to avoid his exposure to the virus.

Doc. No. 142-2 at 2. The Government does not dispute Dr. Rollin's opinion. Doc. No. 147 at 4.

---

[3] It is also questionable that Conner is able to independently perform the majority of his ADLs and able to care for himself within a correctional facility given that the appropriate placement for him after he is released is at the Iowa Veterans Home, where he will be placed in a nursing unit. *See* Doc. No. 142-5.

[4] *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited June 3, 2020).

Numerous courts have held that a defendant's health conditions and the presence of COVID-19 within BOP facilities constitute extraordinary and compelling reasons for compassionate release. *See, e.g.*, *United States v. Ennis*, No. EP-02-CR-1430-PRM-1, 2020 WL 2513109, at *6 (W.D. Tex. May 14, 2020) (defendant was 71 years old and suffering from degenerative spine disease, diabetes, mellitus, hypertension, arthritis, asthma, hypothyroidism and hyperlipidemia); *United States v. Lopez*, No. 18-CR-2846 MV, 2020 WL 2489746, at *3 (D.N.M. May 14, 2020) (defendant was 62 years old and suffering from high blood pressure and type II diabetes); *United States v. Handy*, No. 3:10-cr-128-8 (RNC), 2020 WL 2487371, at *1 (D. Conn. May 14, 2020) (defendant was 53 years old and suffering from congestive heart failure, hypertension, obesity and chronic knee issues); *United States v. Ginsberg*, No. 14 CR 462, 2020 WL 2494643, at *2 (N.D. Ill. May 14, 2020) (defendant was 56 and had a history of cardiac and respiratory disease); *United States v. Gutman*, No. RDB-19-0069, 2020 WL 2467435, at *2 (D. Md. May 13, 2020) (defendant was 56 and suffering from multiple sclerosis and hypertension); *United States v. Rivernider*, No. 3:10-cr-222 (RNC), 2020 WL 2393959, at *1 (D. Conn. May 12, 2020) (defendant was 54 and suffering from diabetes, heart disease and hypertension); *United States v. Ullings*, No. 1:10-cr-00406, 2020 WL 2394096, at *1 (N.D. Ga. May 12, 2020) (defendant was 66 and suffering from hypertension and obesity); *United States v. Reddy*, No. 13-cr-20358, 2020 WL 2320093, at *1 (E.D. Mich. May 11, 2020) (defendant was 73 years old and suffering from type II diabetes, hypertension and orthopedic problems); *United States v. Foreman*, No. 3:19-cr-62 (VAB), 2020 WL 2315908, at *3 (D. Conn. May 11, 2020) (defendant was 58 years old and suffering from hypertension and obesity); *United States v. Simpson*, No. 11-cr-00832-SI-3, 2020 WL 2323055, at *1 (N.D. Cal.  May 11, 2020) (defendant was 62 years old and suffering from asthma and diabetes); *United States v. Valencia*, No. 15 Cr. 163 (AT), 2020 WL 2319323, at *1 (S.D.N.Y. May 11, 2020) (defendant was suffering from heart disease, high blood pressure and epileptic seizures); *United States v. Joseph*, No. 18-cr-00350-BLF-1, 2020 WL 2315806, at *1 (N.D. Cal. May 8, 2020)

13

(defendant was 60 years old and suffering from lung scarring resulting from coccidioidomycosis); *United States v. Pena*, No. 15-cr-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) (defendant was 60 years old and suffering from hypertension and hyperlipidemia); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *4 (E.D. Mich. May 7, 2020) (defendant was 45 years old and suffering from type II diabetes, hypertensive heart disease, cardiac arrhythmia, obstructive sleep apnea and asthma); *United States v. Diep Thi Vo*, No. 15-cr-00310-BLF-2, 2020 WL 2300101, at *3 (N.D. Cali. May 7, 2020) (defendant was 74 years old and suffering from hyperlipidemia, hypertension, vision issues and osteoarthritis); *Casey v. United States*, No. 4:18-cr-4, 2020 WL 2297184, at * (E.D. Va. May 6, 2020) (defendant was 76 years old and suffering from serious cardiac issues); *United States v. Howard*, 4:15-CR-00018-BR, 2020 WL 2200855, at *3 (E.D.N.C. May 6, 2020) (defendant was 52 years old and suffering from COPD, type II diabetes, obesity, stage 3 kidney disease, edema and a diaphragmatic hernia); *United States v. Quintero*, No. 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (defendant was suffering from diabetes, a compromised immune system, obesity and hypertension); *United States v. Saad*, No. 16-20197, 2020 WL 2251808, at *5 (E.D. Mich. May 5, 2020) (defendant was 71 years old and suffering from chronic kidney disease, hypertension, pulmonary hypertension, sleep apnea and shingles); *United States v. Reid*, No. 17-cr-00175-CRB-2, 2020 WL 2128855, at *1 (N.D. Cali. May 5, 2020) (defendant was 71 years old and suffering from Valley Fever, hypertension and high cholesterol and a prostate cancer survivor); *United States v. McCarthy*, No. 3:92-CR-0230 (JCH), 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020) (defendant was 65 years old and suffering from asthma and COPD).

Case 5:07-cr-04095-LTS-KEM   Document 152   Filed 06/08/20   Page 14 of 22

While I appreciate that the BOP has taken many measures to prevent the transmission of COVID-19 among its inmate population,[5] the virus has nonetheless spread through many BOP facilities. The BOP reported on May 1, 2020, that it had tested 2,700 out of the 146,000 inmates within the BOP system for COVID-19, with 70 percent of those tested being positive.[6] As of June 4, 2020, no inmates have tested positive for COVID-19 at Conner's facility, Rochester FMC.[7] One staff member has tested positive but has since recovered.[8] However, without knowing whether the BOP is actively testing inmates and staff members for COVID-19 at Rochester FMC, no active confirmed cases does not mean that COVID-19 is not present at the facility. Nor does it mean there will not be a future outbreak at the facility. As the Government acknowledges, despite extensive measures to prevent transmission, more federal inmates will inevitably contract COVID-19 going forward.[9] *See* Doc. No. 147 at 8.

---

[5] According to the BOP's website, those measures have included limiting inmate movement within each facility and between facilities, suspending visits, suspending staff training and travel, screening staff and inmates for COVID-19 symptoms and modifying operations to maximum social distancing to the extent possible. *BOP Implementing Modified Operations*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 5, 2020).

[6] Bureau of Prisons, Twitter, (May 1, 2020, 8:03 AM), https://twitter.com/OfficialFBOP/status/1256207531820662785.

[7] *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 5, 2020).

[8] *Id.*

[9] Other BOP medical facilities have experienced COVID-19 outbreaks. As of June 4, 2020, 271 inmates, or 20 percent of inmates, have tested positive for COVID-19 at Lexington FMC, and 5 of those have died. At Devens FMC, 53 inmates (5 percent of inmates) have tested positive, 1 of which has died. At Fort Worth FMC, 631 inmates (44 percent of inmates) have tested positive, and 10 of those have died. At Butner FMC, 5 inmates have tested positive. At Carswell FMC, 2 inmates have tested positive, 1 of which has died. *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 5, 2020).

The Government points out that long-term care facilities are confronted with similar problems in controlling the spread of COVID-19. *See* Doc. No. 147 at 4. Conner's proposed release location is the Iowa Veterans Home in Marshall, Iowa. *See* Doc. No. 142-5; Doc. No. 142-6. According to the State of Iowa's COVID-19 website, as of June 4, 2020, 34 residents and staff members at the Iowa Veterans Home have tested positive for COVID-19, and 16 of those have recovered.[10] The Iowa Veterans Home has suspended all admissions due to COVID-19[11] and, like the BOP, has taken other precautions to prevent transmission of the virus.[12] Once the suspension of admissions is lifted, Conner can be admitted within one to two weeks. *Id.*

Due to the nature of BOP correctional facilities and long-term care facilities, there is some risk that Conner may contract COVID-19 at either Rochester FMC or the Iowa Veterans Home. However, his comparative risk of contracting COVID-19 at one facility or the other does not impact the relevant question, which is whether Conner has established extraordinary and compelling reasons. As explained above, Conner can establish extraordinary and compelling reasons even without considering COVID-19

---

[10] *COVID-19 In Iowa*, https://coronavirus.iowa.gov/pages/long-term-care (last visited June 5, 2020). There are approximately 500 residents and 900 staff members at the Iowa Veterans Home. *About the Iowa Veterans Home*, Iowa, https://ivh.iowa.gov/about (last visited June 3, 2020). The Iowa Veterans Home conducted mass testing at the end of April 2020. *Iowa Nursing Home for Veterans Says Two Residents Have Virus*, Siouxland Proud (Apr. 25, 2020), https://www.siouxlandproud.com/news/iowa-news/iowa-nursing-home-for-veterans-says-two-residents-have-virus/.

[11] *See* Doc. No. 142-6.

[12] *See Novel Coronavirus (COVID-19) – Long Term Care*, Iowa Department of Public Health (IDPH), https://idph.iowa.gov/Emerging-Health-Issues/Novel-Coronavirus/Long-Term-Care (last visited June 3, 2020) (providing guidance for long term care facilities to follow to protect residents from COVID-19); *Hear from an Iowa Nurse on the Front Lines of COVID-19*, Local 5 News (Apr. 30, 2020), https://www.weareiowa.com/article/news/health/coronavirus/iowa-veterans-home-nurse-marshalltown-coronavirus-outbreak-front-lines-covid-19/524-b7c551f9-5cd8-4ecf-8632-db6084b7f020.

pandemic. Accordingly, Conner's motion should not be denied simply because there are confirmed COVID-19 cases at his proposed release location.[13] Instead, if compassionate release is appropriate way, steps can be taken to delay execution of the court's order and to fashion sensible conditions of supervised release to mitigate Conner's potential exposure to COVID-19 upon release. Thus, I will proceed with the compassionate release analysis.

## C.     *Section 3553(a) Factors and Danger to Community*

Whether Conner is a danger to the community and whether the § 3553(a) factors support Conner's release are the more challenging questions in this case. Guideline § 1B1.13(2) provides that compassionate release is appropriate only where "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section § 3582(c)(1)(A) requires a court to consider the factors set forth in 18 U.S.C. § 3553(a) before granting a motion for compassionate release. Section 3553(a) requires that I consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

---

[13] Given Connor's medical needs and finical restrictions, the Iowa Veterans Home appears to be his best, and currently only, placement option following release.

17

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [issued by the Sentencing Commission . . .;]

(5) any pertinent policy statement [issued by the Sentencing Commission . . .']

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Conner acknowledges that his present offense is serious. Doc. No. 142 at 15. However, he argues that it is a non-violent drug offense. *Id.* He also argues that he has served more than two-thirds of his sentence and early release would not minimize the seriousness of his offense or undermine deterrence. Doc. No. 151 at 6. He also acknowledges his criminal history but argues he is not a danger to the community because he has been disciplinary free in prison since a 2013 incident with heroin. Doc. No. 142 at 15. He also points to the fact that he is going to require ongoing health care at a facility such as the Iowa Veterans Home. *Id.*

The Government argues that the Section 3553(a) factors weigh against early release. Doc. No. 147 at 10. The Government correctly notes that Conner is a career offender with a lengthy criminal history. *Id.* The Government also argues that Conner still poses a danger to the community, pointing out that he was suffering from many of his present health conditions when he committed the instant offense. *Id.*

Considering the § 3553(a) factors, the nature and circumstances of the instant offense and Conner's criminal history are undoubtedly serious and weigh against granting compassionate release. His offense in this case involved participation in a conspiracy to distribute a large amount of methamphetamine. Doc. No. 108 at ¶¶ 18–23. He committed the offense while on supervised release following a previous federal felony

conviction.[14]  *Id.* at ¶ 55.  Committing another federal offense while on supervised release is very serious.  However, the offense conduct did not involve any violence.  Conner also has a lengthy and serious criminal history.  *See id.* at ¶¶ 40–53.  Again, however, that history does not involve any violent crimes. Apart from the prior federal conviction, Conner's criminal history includes convictions for larceny, forgery, burglary, theft, OWI, carrying a concealed weapon, possession of a controlled substance and delivery of a controlled substance.  *Id.* at ¶¶ 40–52.

The remaining § 3553(a) factors outweigh the seriousness of the present offense and Conner's criminal history.  Conner's most relevant personal characteristics (age, poor health and resulting vulnerability to COVID-19) weigh heavily in favor of release. Conner suffers from numerous serious health conditions and his mobility is extremely limited because of back pain.  He has served much of his sentence while battling his health problems and experiencing significant pain.  This means that his sentence has been significantly more laborious than that served by most inmates.  *See United States v. McGraw*, No. CR02-00018, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019); *Beck*, 2019 WL 2716505, at *11; *United States v. Gray*, No. CR02-00018, 2019 WL 4572816, at *5 (S.D. Ind. Sept. 20, 2019).

Releasing Conner will not pose a danger to the safety of the community because in his current state, his ability to be a threat is significantly diminished.  He is largely confined to his wheelchair, requires almost constant supplemental oxygen, uses inhalers multiple times in a day and requires constant wound care.  He is unable to travel without

---

[14] In 1996, Judge Bennett sentenced Conner to 120 months' in prison for possession of a stolen firearm.  Doc. No. 108 at ¶ 12.  In that case, Conner and others broke into residences and stole items, including firearms, to finance their drug habit.  CR96-4009-MWB, Doc. No. 343.  This is serious conduct which is compounded by the fact that there is always a risk that stolen firearms will then be used to commit additional crimes which could include injury or death.

19

the assistance of others. His health conditions mean that he will likely have to reside at a long-term care facility for the remainder of his life.[15]

In addition, Conner has demonstrated largely good behavior while incarcerated. He was found in possession of heroin in 2013 but has maintained clear conduct otherwise. Doc. No. 147-1 at 2. He has obtained his GED and participated in drug treatment programing. *Id.* at 1. As discussed above, his proposed release plan is to live at the Iowa Veterans Home, where Conner will have access to on-site medical services and a supportive community.[16] Conner will not be returning to the same environment to which he was released from prison in 2004 and started committing the instant offense. Further, Conner will be subject to supervised release for ten years following his release. *See* Doc. No. 106 at 3. Supervised release will reduce whatever risk Conner may pose to the public. *See Schmitt*, 2020 WL 96904, at *5.

Conner has been incarcerated for approximately 144 months. *See* Doc. No. 29 (stating that he has been detained since approximately May 6, 2008, for the current offense). His projected release date is less than three years away. His difficult incarceration, his health-related physical limitations and the continued restrictions on his freedom through the use of supervised release, together, satisfy the goal of imposing sufficient punishment. I have no concern that releasing Conner under these unusual circumstances would undermine the goal of deterrence. Nor would his release produce an unwarranted sentencing disparity, as the reduced sentence would account for his

---

[15] While the Government correctly points out that Conner committed the instant offense while suffering from some of his current ailments, there is no question that his health has sharply declined while he has been incarcerated.

[16] *See Life at IVH*, Iowa Veterans Home, https://ivh.iowa.gov/admissions (last accessed June 3, 2020).

unique medical circumstances.[17]   After considering all of the applicable factors, I find that Conner is eligible for compassionate release and will therefore grant his motion.

## V.   CONCLUSION

For the foregoing reasons:

1.      Defendant Larry Conner's motion (Doc. No. 141) for compassionate release is **granted**.  However, execution of this order is **stayed** for twenty-eight (28) days to allow the Bureau of Prisons and United States Probation an opportunity to make the necessary arrangements for Conner's release.[18]

2.      Based on the stay of execution described in the preceding paragraph, Conner's term of imprisonment is hereby **reduced** to **time served as July 6, 2020**.

3.      All other aspects of the judgment (Doc. No. 106) remain in effect, including those related to Conner's term of supervised release.

4.      The Clerk of Court shall provide a copy of this order to the Probation Office and the institution where Conner is incarcerated.

---

[17] While not dispositive and acknowledging that Conner was sentenced according to an 11(c)(1)(C) agreement, it is likely that Conner would have already been released if he were sentenced according to today's law.  While there have been various changes in the law that would affect Conner's sentence, of greatest note is that Conner's mandatory minimum under today's law would be 15 years rather than 20 years and he would no longer be classified as a career offender pursuant to U.S.S.G. § 4B1.1.  *See* First Step Act, Pub. L. No. 115-391, § 401(a)(2)(A), 132 Stat. 5194, 5220; Doc. No. 108 at ¶¶ 35, 52 (one of Conner's career offender predicates was an Iowa burglary conviction); *Mathis v. United States*, 136 S. Ct. 2243, 2257 (2016) (holding that Iowa's burglary statute is broader than generic burglary).

[18] This extended stay is intended to provide time for Connor to be admitted to the Iowa Veterans Homes or for other suitable arrangements to be made.

21

**IT IS SO ORDERED.**

**DATED** this 8th day of June, 2020.

_____
Leonard T. Strand, Chief Judge